## UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL R. KOLE, | ) | |
| JOSEPH L. WEINGARTEN, | ) | |
| and GLENN J. BROWN, individually and | ) | |
| on behalf of all others similarly situated | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-CV-01735-TWP-DML |
| | ) | |
| SCOTT FAULTLESS, DANIEL HENKE, | ) | |
| EILEEN PRITCHARD, | ) | |
| STEWART EASLEY, DAVID GEORGE, | ) | |
| ARTHUR LEVINE, individually and in | ) | |
| their official capacity as | ) | |
| THE TOWN COUNCIL OF FISHERS, | ) | |
| INDIANA and FALL CREEK TOWNSHIP, | ) | |
| | ) | |
| Defendants. | ) | |

### ENTRY ON DEFENDANTS' MOTION TO DISMISS AND ALTERNATIVE MOTION TO SET A BOND ON PLAINTIFFS' STATE CLAIMS

This action arises out of an alleged violation of Plaintiffs' constitutionally protected voting rights. The Plaintiffs in this matter are registered voters- Michael R. Kole, a resident of the Town of Fishers, Indiana ("Fishers"), and Joseph L. Weingarten, and Glenn J. Brown, residents of Fall Creek Township, Hamilton County, Indiana (collectively, "Plaintiffs"). The Defendants in this matter are the Town Council of Fishers Indiana (the "Town Council"), Fall Creek Township, and individual members of the Town Council of Fishers, Indiana – Scott Faultless, Daniel Henke, Eileen Pritchard, Stewart Easley, David George, and Arthur Levine (collectively, "Defendants"). This matter is before the Court on the Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint [Dkt. No. 21]. In the alternative, Defendants have requested that the Court set a bond on Plaintiffs' state law claims. Also, because the Defendants

have been sued in their individual capacities, they have requested that the Court grant them immunity from individual liability.

The Plaintiffs allege two types of constitutional violations that would give this Court jurisdiction.  First, Plaintiffs allege that Defendants' proposed reorganization of the Town of Fishers, wherein Plaintiffs would be unable to elect the mayor and have a city council that is elected entirely at-large, would violate Plaintiffs' constitutional right to vote (herein, referred to collectively as "Structural Claims").  Second, Plaintiffs allege that the timing and circumstances of a referendum scheduled by Defendants to decide whether Fishers should merge with Fall Creek Township and become a traditional city, under Indiana law, violates Plaintiffs' constitutional right to vote (herein referred to as "Election Claims").  Defendants argue that Plaintiffs' claims are merely state law claims that have been improperly cloaked in federal law and, therefore, Plaintiffs' First Amended Complaint fails to state a valid federal claim upon which relief may be granted.  For the reasons set forth below, Defendants' Motion to Dismiss [Dkt. 21] is **DENIED**.  Alternatively, based on applicable abstention principles, the Court will stay proceedings and retain jurisdiction of Plaintiffs' potential federal claims pending the determination of Plaintiffs' state law claims in Indiana state court.

## I.   BACKGROUND

This lawsuit concerns the Town Council's alleged failure to allow Plaintiffs to exercise their state-granted voting right to vote for city status and the Town Council's adoption of a plan that eliminates the additional right of Plaintiffs to vote for city officials. Plaintiffs contend that Ind. Code § 36-4-1-1 *et. seq.* (the "Incorporation Act") unequivocally grants Indiana citizens certain voting rights and that actions taken by the Defendants will deprive Plaintiffs of those rights in violation of both Indiana law and the United States Constitution.  However, Defendants

maintain that a more recently enacted set of statutes – Ind. Code § 36-1.5-1-1 *et seq.* (the "Reorganization Act") – grants local governments, like Defendants, the authority to reorganize Fishers in a manner different than what is contemplated by the Incorporation Act.

## A.    Events Leading up to the Lawsuit

On May 3, 2010, Plaintiffs filed a petition with the Fishers' Town Clerk pursuant to Ind. Code § 36-4-1.5 *et seq.* requesting that the Town Council of Fishers adopt a resolution allowing Fishers' voters to determine whether Fishers should be changed from a town to a city. Since that time, Defendants have failed to hold the statutorily required vote on this issue.  On May 5, 2010, two days after the petition was filed, members of the Town Council began planning to adopt an alternate resolution proposing a reorganization of Fishers with Fall Creek Township (the "Reorganized City") under the Reorganization Act.  In November of 2010, the Town Council began the adoption process for a reorganization plan and ultimately adopted a final revised reorganization plan (the "Reorganization Plan").  On February 21, 2011, Defendants passed a resolution that acknowledged Plaintiffs' petition and scheduled a referendum vote on city-status to occur at the next general election in November of 2012.   A vote on Defendants' Reorganization Plan (i.e. the Reorganized City) will also occur on the same general election ballot.[1]

Plaintiffs' originally filed an action in state court and later, voluntarily dismissed their claims and sought relief in federal court, in part based upon the Defendants argument that Plaintiffs claims concerned the fundamental right to vote.

---

[1] To clarify, the November 2012 ballot will include referendums for two separate options. The first is a referendum on traditional city-status pursuant to Plaintiffs' petition.  The second will be an option for the Defendants' proposed Reorganized City.

**B.**      **Plaintiffs' Amended Complaint**

Plaintiffs have filed this suit challenging the constitutionality of the Reorganization Plan because it purports to restructure Fishers in a manner inconsistent with the Incorporation Act.  In their Amended Complaint, Plaintiffs assert that the Reorganization Plan will do the following:

1. Change Fishers from a town to a "non-traditional second class city" (i.e. the Reorganized City) while denying voting rights to Fishers citizens that would otherwise be available under Indiana law.

2. Redefine election requirements for a city mayor under Indiana law so that the Reorganized City's mayor would be *appointed* by the city council, rather than elected by Fishers' voters pursuant to Ind. Code § 36-4-5-2 (i.e. the Incorporation Act).

3. Redefine election requirements so that all city council members in the Reorganized City would be elected at-large (in conflict with Ind. Code § 36-4-6-3, which provides for a different election procedure for electing city council members).

Defendants do not deny that the Reorganized City will in fact have a city council that is elected entirely at-large, nor do they deny that the mayor of the Reorganized City would be appointed by the city council rather than elected by the voters.  Instead, Defendants maintain that the Reorganization Act grants to all political subdivisions, including Fishers, the authority to reorganize into the proposed structure of the Reorganized City.

In addition to claims against the Reorganization Plan, Plaintiffs allege that Defendants violated their fundamental voting rights by failing to hold a vote on city-status in accordance with state law.  Specifically, Plaintiffs' Election Claims are comprised of two challenges to the scheduled referendum: (1) the referendum on the vote for traditional city-status will be placed on

the ballot along with the allegedly illegitimate option of voting for an unconstitutional Reorganized City; (2) the scheduling of the referendum for the next general election in November of 2012 is unreasonable and amounts to a willful deprivation of Plaintiffs' right to vote on city-status.

## C.   <u>The Incorporation Act</u>

Plaintiffs contend that Indiana has granted voting rights in local elections that are protected by the federal Constitution.   In support of this contention, Plaintiffs cite to the following sections of the Incorporation Act:

1. A mayor, who is the city executive, *shall be elected* under IC 3-10-6 *by the voters of each city*.  Ind. Code § 36-4-5-2(a) (emphasis added).

2. "Each voter of the city may vote for three (3) [city council member] candidates for at-large membership *and one (1) candidate from the district in which the voter resides*."  Ind. Code § 36-4-6-3(i) (emphasis added).

3. "The town legislative body must adopt a resolution submitting to the town's voters the question of whether the town should be changed into a city." Ind. Code § 36-4-1.5-2(1)

Ind. Code §§ 36-4-5-2(a) & 36-4-6-3(i) are the bases both of Plaintiffs' Structural Claims and Election Claims. Meanwhile, Ind. Code § 36-4-1.5-2(1) provides additional grounds for Plaintiffs' Election Claims.

## D.   <u>The Reorganization Act</u>

To support their position, Defendants rely upon the Reorganization Act, which was passed by the Indiana General Assembly in 2006, twenty years subsequent to the Incorporation Act.  The purpose of the Reorganization Act is to:

[g]rant broad powers to enable political subdivisions to operate more efficiently by eliminating restrictions under existing law that ... impede the economy of

> operation of; ... interfere with the ease of administration of; … inhibit cooperation among; and ... thwart better government by; ... political subdivisions.

Ind. Code § 36-1.5-1-1.   The Reorganization Act allows for local entities to reorganize themselves by changing the structure or administration of a political subdivision.   This includes merging with other government bodies, transferring government functions between offices, and designing new legislative, executive, or fiscal bodies.   Ind. Code § 36-1.5-4-4.   A political subdivision may exercise powers granted by the Reorganization Act "without complying with the provisions of any other law, statute, or rule." Ind. Code § 36-1.5-1-4. The Reorganization Act states that "[e]xcept as otherwise specifically provided by law, to the extent the provisions of this article are inconsistent with the provisions of any other general, special, or local law, the provisions of this article are controlling, and compliance with this article shall be treated as compliance with the conflicting law." Ind. Code § 36-1.5-1-6.   Furthermore, the Reorganization Act states that its provisions should be "liberally construed" to effect its purposes.   Ind. Code § 36-1.5-1-5.

## II.   <u>LEGAL STANDARD</u>

When evaluating a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), the court shall take all facts alleged in the complaint as true and make all reasonable inferences in favor of the non-moving party.  *Pisciotta v. Old National Bancorp,* 499 F.3d 629, 633 (7th Cir. 2007).   Federal Rules of Civil Procedure 8(a)(2) requires only that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).   It is not required that a complaint state detailed factual allegations; however, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2004). In other words, the complaint must include enough facts to state a claim of relief which is "plausible on its face." *Id.* at 570.  A

6

claim is facially plausible if the complaint contains facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

### III.   DISCUSSION

Plaintiffs have asserted that Defendants' Reorganization Plan constitutes a violation of local voting rights protected by Indiana law and the First and Fourteenth Amendments of the United States Constitution.  Plaintiffs contend that the Incorporation Act, among other things, provides Indiana citizens with the right to vote for a city mayor.  Conversely, Defendants maintain that there is no independent federal constitutional right to have a municipality structured to the Plaintiffs' liking and these claims are improperly in federal court.  This motion rests upon the question of whether Indiana state law has afforded Indiana voters with the voting rights at issue in this case and, if so, whether Defendants' alleged violation of those rights are properly in federal court.  In other words, the need to address quintessentially federal "issues" is entirely contingent on a threshold interpretation of Indiana law. For the reasons explained below, the Court finds that, at this juncture, a federal court is not the proper forum for deciding these threshold issues of state law.

### A.    Constitutional Protection of State and Local Voting Rights

To the extent that Plaintiffs argue the United States Constitution ("Constitution") provides protection for state and local voting rights, they are, generally speaking, correct. "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear." *Reynolds v. Sims,* 377 U.S. 533, 554 (1964).  However, "[s]tates do have latitude in determining

whether certain public officials shall be selected by election or chosen by appointment and whether various questions shall be submitted to the voters." *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 629 (1969) (citing *Sailors v. Kent County Board of Education,* 387 U.S. 105, 108 (1967).  In *Sailors,* the Supreme Court stated that it could "find no constitutional reason why state or local officers of the nonlegislative character ... may not be chosen by the governor, by the legislature, or by some other appointive means rather than by election." *Sailors,* 387 U.S. at 108.  That said, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Virginia State Board of Education,* 383 U.S. 663, 665 (1966).  In other words, Indiana is not bound by the Constitution to grant Indiana citizens the right to elect a city mayor; however, if the State grants that right to the voters, that right to vote is then protected by the Constitution.

Ultimately, "control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates.  [P]olitical subdivisions exist solely at the whim and behest of their State." *Hess v. Port Authority Trans-Hudson Corp.,* 513 U.S. 30, 47 (1994) (citation and internal quotations omitted).  Thus, even if Indiana once granted rights based on city-status under the Incorporation statute, it is within the State's authority to modify or abrogate those rights, if it sees fit to do so.  Simply stated, if the Reorganization Act allows for a town – in this case Fishers – to reorganize into a city without an elected mayor, then Plaintiffs are without a legitimate claim under the United States Constitution.

**B.**     **The Doctrine of Abstention**

Defendants argue that the Reorganization Act works to effectively modify the right to vote for a city mayor, as previously granted in the Incorporation Act, and purports to delegate authority to organize towns and cities to individual political subdivisions, like Fishers.

8

Defendants contend that, at most, Plaintiffs' suit presents purely state law questions concerning Defendants' ability to reorganize Fishers under Indiana state law and, thus, there is no federal jurisdiction.   Indeed, the Court agrees that this suit presents a threshold question as to the interpretation of Indiana law and whether that law guarantees Plaintiffs the rights that they claim it does.  However, the fact that Plaintiffs' federal claims are contingent upon an interpretation of state law does not automatically rob this Court of subject-matter jurisdiction.  *See Zwickler v. Koota,* 389 U.S. 241, 251 (1967) ("[I]f a state statute is not fairly subject to an interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question when presented to it.") (quoting *United States v. Livingston,* 179 F.Supp. 9, 12-13 (E.D.S.C. 1959; statutory three-judge court), *aff'd* 364 U.S. 281 (1960); *see also Nickerson v. Thomson,* 504 F.2d 813 (7th Cir. 1974).

The nature of this case presents the Court with a unique issue, where a party's federal claims may be modified or abrogated by, and thus are contingent upon, the interpretation of state law. Thus, although the parties have not directly briefed this particular area of law, the Court finds it appropriate to consider the doctrine of abstention on its own initiative.  *See Smith v. Cherry,* 489 F.2d 1098, 1101 (7th Cir. 1973) (the court considered applicability of abstention, despite defendant's brief failing to address it in any detail, where defendant argued that the action involved 'solely a matter of Illinois election laws applied to a local Illinois election.').

The doctrine of abstention finds its roots in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496 (1941), where Justice Frankfurter, writing for a unanimous Supreme Court, fashioned the beginnings of what would come to be known as the modern doctrine of abstention. In *Pullman,* the district court enjoined an order by the Texas Railroad Commission as offensive to the equal protection clause; however, the Supreme Court reversed with directions to stay

proceedings pending a determination of the issues in state court. *Id.* at 501-502. The court's decision was based upon whether the Texas Railroad Commission's order was authorized by a Texas statute — a statute that was far from clear. As the Court stated,

> ... the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. ... The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

*Id.* at 500 (citations omitted). The court expressed the judiciary's interest in the "avoidance of needless friction with state policies" and promoted a "doctrine of abstention appropriate to our federal system whereby the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and for the smooth working of the federal judiciary." *Id.* at 500-501 (citations and internal quotation marks omitted).

Since *Pullman,* the doctrine of abstention and its appropriate application have been both clarified and narrowed. *See, e.g., Zwickler,* 389 U.S. 241 (1967); *Harrison v. NAACP,* 360 U.S. 167 (1959). Following the Supreme Court's decision in *Zwickler,* the doctrine of abstention may be applied "only in narrowly limited special circumstances." *Nickerson,* 504 F.2d at 815.[2] The Supreme Court has emphasized that "abstention cannot be ordered simply to give state courts the first opportunity to vindicate the federal claim." *Zwickler,* 389 U.S. at 251 (citing *McNeese v. Board of Education,* 373 U.S. 668 (1963)). Rather, abstention requires the "*susceptibility of a state statute of a construction by the state courts that would avoid or modify the constitutional*

---

[2] Upon considering the narrow circumstances under which a court may abstain, the court in *Nickerson* posited that "[f]ederal courts may, for example, abstain out of regard for the interests and sovereignty of the state and to avoid needless resolution of a constitutional question." *Nickerson,* 504 F.2d at 815.

question." *Id.* at 249 (citing *Harrison,* 360 U.S. 167) (emphasis added). Simply stated, abstention is proper when the state law at issue may be reasonably interpreted so as to alter, or altogether avoid, a constitutional question. Here, the Court believes that it has been presented with those precise circumstances.

**C.    The Reorganization Act is Susceptible to Varying Interpretations**

The parties have vehemently argued varying interpretations of the Reorganization Act. The proposition that the statutes at issue are susceptible to competing interpretations is evidenced by the parties' extensive briefing on the subject, as well as their discussion of statutory interpretation at oral argument. On the one hand, Plaintiffs contend that the Reorganization Act incorporates definitions from Indiana's election code, excluding the possibility that it is inconsistent with the Incorporation Act; thus, because there is no inconsistency amongst Indiana law, the Reorganization Act does not allow Defendants to reorganize in a way that is at odds with the Incorporation Act, as contemplated by the current Reorganization Plan. And on the other, Defendants argue that the Reorganization Act is controlling and that its broad language allows for the type of reorganization envisioned in Defendants' Reorganization Plan. Both parties present more-than-plausible arguments for their respective positions.

Suffice it to say, the Court finds that Defendants have demonstrated that the Reorganization Act is susceptible to a reasonable construction that would avoid a constitutional question. Because only Defendants' construction of Indiana law is germane to the question of abstention, the Court will address Defendants' interpretation below but forgo an exhaustive discussion of Plaintiffs' interpretation of Indiana law.[3]

---

[3] The Court notes that any discussion of interpretation favorable to the Defendants in no way reflects the Court's opinion as to the merits of Defendants' proposed construction, nor should it be taken to suggest that the Court believes one party's construction to be more compelling than the other. The Court reiterates that the sole purpose is

As previously stated, the purpose of the Reorganization Act is to:

(1) Grant broad powers to enable political subdivisions to operate more efficiently by *eliminating restrictions under existing law* that: (A) impede the economy of operation of; (B) interfere with the ease of administration of; (C) inhibit cooperation among; and (D) thwart better government by; political subdivisions.

(2) Encourage efficiency by and cooperation among political subdivisions to: (A) reduce reliance on property taxes; and (B) enhance the ability of political subdivisions to provide critical and necessary services.

Ind. Code § 36-1.5-1-1 (emphasis added).  The Reorganization Act provides for the "full and complete authority for the ... [r]eorganization of political subdivisions."  Ind. Code § 36-1.5-1-2. "Reorganization" is defined broadly by the Reorganization Act, meaning "a change in the structure or administration of a political subdivision."  Ind. Code § 36-1.5-2-5.  Defendants argue that a "change in the structure or administration" of Fishers is precisely what the Reorganization Plan aspires to accomplish.  The Reorganization Act, more specifically, provides that a political subdivision may merge with other governmental bodies, transfer governmental functions between offices, and create new legislative, executive, or fiscal bodies.  *See* Ind. Code § 36-1.5-4-4.  Moreover, the Reorganization Act provides for the *transfer of functions among elected offices* and, by way of a cooperative agreement, even the *abolishment of an elected office*, given that the office is not required by the Indiana Constitution.  *See* Ind. Code §§ 36-1.5-4-42 and 36-1.5-5-3.  Ultimately, Defendants maintain that these provisions, in no uncertain terms, provide a legitimate basis for the Reorganized City.

Furthermore, in addition to broad language granting the authority to reorganize, Defendants contend that the Reorganization Act explicitly states through several provisions that it governs over any contradictory law, including the Incorporation Act.  As stated previously, the Reorganization Act confers "full and complete authority" for a local body to reorganize.  The

---

to discuss the *susceptibility* of the Reorganization Act to a construction by a state court that may avoid a constitutional question.

Reorganization Act provides that, "[e]xcept as provided in this article, no law ... is required for political subdivisions to ... reorganize [or] transfer responsibilities between offices and officers." Ind. Code § 36-1.5-1-3.  Moreover, "[a] political subdivision may exercise the powers granted under this article to reorganize ... *without complying with the provisions of any other law, statute, or rule.*"  Ind. Code § 36-1.5-1-4 (emphasis added).  Finally, "[e]xcept as otherwise provided by law, to the extent the provisions of this article are inconsistent with the provisions of any other general, special or local law, *the provisions of this article are controlling, and compliance with this article shall be treated as compliance with the conflicting law.*"  Ind. Code § 36-1.5-1-6 (emphasis added).  Together, Defendants take these provisions to mean that the Town Council of Fishers need not look to other Indiana statutes, including the Incorporation Act, to determine whether its municipal reorganization is lawful and that the Reorganization Act, for all intents and purposes, trumps the Incorporation Act.

Given the broad language of the Reorganization Act and provisions providing that the Reorganization Act is "controlling" over any "inconsistent" state law, the Court finds that it would not be unreasonable to infer that the Reorganization Act grants the authority to reorganize in the manner contemplated by Defendants' Reorganization Plan.  In this instance, it appears that the requirement of *Zwickler* is met, where "the state statute is of an uncertain nature, and is obviously susceptible of a limiting construction." *Zwickler,* 389 U.S. at 251 n. 14 (citations omitted).  *Cf. Nickerson,* 504 F.2d at 816 (abstention was inappropriate where the statute at issue was not fairly subject to an interpretation that may avoid a constitutional question, and "the statute clearly impose[d] a mandatory duty on defendants ...").

**D.      The Reorganization Act has not been Construed by an Indiana Court**

   In addition to being susceptible to competing interpretations, it does not appear that the Reorganization Act has ever been interpreted by an Indiana state court.  Neither party has provided the Court with such case law, and the Court has found none.  This fact lends further credence to the proposition that abstention is appropriate.

   In *Reid v. Board of Education of City of New York,* the Second Circuit held that abstention by the district court was proper.  *Reid,* 453 F.2d 238 (2nd Cir. 1971).  In *Reid,* the plaintiffs brought suit against a New York school system for alleged violations of plaintiffs' constitutional rights, including due process, equal protection, and the right to education.  The court noted that plaintiffs clearly had substantial statutory claims, as well as state constitutional claims, under New York law but that those state provisions were unclear.  *Id.* at 240.  The court discussed the lack of guidelines as to reasonable compliance with the relevant state statutory and constitutional provisions and reasoned as follows:

> [W]e are not aware of any state court decision defining the obligations of the Board under section 4404 or Article XI of the New York constitution so that a federal court would be aided in disposing of the state claims under pendent jurisdiction. This is precisely the situation Justice Frankfurter warned against in *Pullman*: a tentative decision by the district court on the State law claims which might be replaced by an authoritative state adjudication.

*Id.* at 242-243 (citation and internal quotation marks omitted).  *Cf. Smith v. Cherry,* 489 F.2d 1098, 1101 (7th Cir. 1973) (when "[t]he statute is clear on its face and *has been construed literally by the highest state court ...* there is no basis for abstention in hopes that the statute can be construed so as to render it unnecessary to decide the federal issues.") (Emphasis added).

   Similar to the circumstances of *Reid*, this Court is without guidance as to how provisions of the Reorganization Act may be interpreted by a state court.  And by extension, it is unclear to what extent, if any, the Reorganization Act is limited by the provisions of the Incorporation Act.

**E.      Other Considerations Regarding Abstention – Federalism & Federal-State Relations**

Although the discussion above constitutes sufficient reason to warrant abstention, it is worth mentioning that underlying principles of federalism and requisite regard for federal-state relations bolster the Court's determination that abstention is appropriate here.  Ultimately, this case concerns questions of local elections and the state's discretion in controlling its local governmental instrumentalities. These are, no doubt, inherently state interests. Cities and counties are

> ... created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them, and the number, nature, and duration of the powers conferred upon (them) *** and the territory over which they shall be exercised rests in the absolute discretion of the state.  The relationship of the States to the Federal Government could hardly be less analogous.

*Reynolds,* 377 U.S. at 575 (1964) (citing *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178 (1907); internal quotations omitted).

The undertones of federalism are evident in the Supreme Court's decision in *Pullman*. Moreover, the ability of a court to abstain out of regard for federal-state relations has been acknowledged time and again by the Supreme Court.  *See, e.g., Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25 (1959); *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814-815 (1976); *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 716-717 (1996).  The Court recognizes that this case will provide the state with an opportunity to, for the first time, shed light on the meaning and scope of the Reorganization Act and clarify the extent of authority a local governmental entity has to reorganize its structure and administration under Indiana law.

Generally, federal courts have a duty to exercise jurisdiction when possible; this duty, however, is not absolute.  *See, e.g., Colorado River,* 424 U.S. at 821.  A court may decline to

exercise jurisdiction "in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest, ..., for example, where abstention is warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Quackenbush,* 517 U.S. at 716 (citing *Colorado River,* 424 U.S. at 817; citations and internal quotation marks omitted). For the reasons discussed above, the Court determines that such exceptional circumstances are present so as to warrant abstention.[4]

### F.    Plaintiffs Election Claims

Plaintiffs' argument is presented such that even if the Reorganization Plan were legitimate, Defendants have nevertheless violated their constitutional right to vote by scheduling the referendum on city-status for the general election in November 2012. Plaintiffs' Election Claims assert both that the timing of the referendum is unconstitutional and that the scheduled vote is unconstitutional because it places an illegitimate option to vote for the Reorganized City on the ballot. Obviously, Plaintiffs' "sham option" argument is predicated upon the assumption that the Reorganization Plan violates Indiana law and thus unconstitutionally deprives voters of the right to vote for city mayor. Therefore, the "sham option" argument is made, for the time being, irrelevant by the Court's decision to abstain. However, there remains a lingering question as to whether Plaintiffs' "timing" argument may stand independent as a federal claim.

First, Defendants contend that Plaintiffs' Election Claims asserting a constitutional right to vote on city-status are moot. Indiana law requires that Defendants fix a date for the referendum vote; however, the statute does not impose explicit time constraints by which that

---

[4] The Court has also considered the Supreme Court's holding in *Quackenbush* that remand or dismissal based on abstention principles is proper only where the relief sought is equitable or otherwise discretionary and not based on common-law action damages. Because the nature of the relief sought in this case is a declaratory judgment and is not based on common-law action damages, the remedy sought here is no bar to the application of abstention.

vote must occur after the petition is filed.  *See* Ind. Code § 36-4-1.5-2.  Defendants argue that because they have scheduled a date for the referendum, Plaintiffs' claims on this matter should be considered moot.  Further, Defendants contend that Plaintiffs' concerns regarding the alleged unreasonableness of the timing of the scheduled vote is yet another quintessential state law claim that may not be brought under Section 1983.  *See Kasper v. Board of Election Commissioners of City of Chicago,* 814 F.2d 332, 342 (7th Cir. 1987) ("The district court has no supervisory powers and no authority to instruct the Board how to follow state law.  A violation of state law does not state a claim under § 1983.").

Plaintiffs disagree, relying primarily on *Hennings v. Grafton,* 523 F.2d 861 (7th Cir. 1975).  Plaintiffs make the following argument, which is quoted directly from their brief: "[i]nfringement of ... voting rights rises to a constitutional level if the <u>timing</u> or <u>circumstances</u> of the ballot evidence 'willful conduct which undermines the organic process by which candidates are elected' or is 'discriminatory by its effect or inherent nature.'" Pl.'s Resp. at 16 (quoting *Hennings,* 523 F.2d at 864) (emphasis in original).  However, Plaintiffs' argument is somewhat misleading.  The court in *Hennings* stated that "not every election irregularity ... will give rise to a constitutional claim and an action under section 1983.  Mere violation of a state statute by an election official, for example, will not."  *Hennings,* 523 F.2d at 864 (citation omitted).  Thereafter, the court listed instances of infringements on voting rights that rise to a constitutional level; they include:

> dilution of votes by reason of malapportioned voting districts or weighted voting systems ... purposeful or systematic discrimination against voters of a certain class ... geographic area ... or political affiliation; ... election frauds; ... and other willful conduct which undermines the organic processes by which candidates are elected.

*Hennings,* 523 F.2d at 864 (citations omitted).  At no point did the court in *Hennings* intimate that the scheduling or *timing* of a local referendum could potentially give rise to a constitutional claim, as is suggested by the Plaintiffs' briefing.

The Court finds the Seventh Circuit's decisions in *Hennings* and *Kasper* to be instructive on this issue.  In *Kasper,* the court stated that "[a] violation of state law does not state a claim under § 1983 ... [and the fact] [t]hat this case involves elections does not matter."  *Kasper,* 814 F.2d at 342.  After all, "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Id.* (citing *Snowden v. Hughes,* 321 U.S. 1, 11 (1944)).  Moreover, none of the instances mentioned in *Hennings* are applicable to the scheduling issue.

The Court in *Hennings* held that "section 1983 is implicated only when there is *'willful* conduct which undermines the organic processes by which candidates are elected.'" *Bodine v. Elkhart County Election Board,* 788 F.2d 1270, 1273 (7th Cir. 1986) (quoting *Hennings,* 523 F.2d at 864) (emphasis in original).  Plaintiffs attempt to categorize the scheduling of the referendum for November 2012 as a willful action intended to debase Fishers' voters and deprive them of their constitutional right to vote.  However, this argument is unavailing.  Requiring Fishers' voters to wait only until the upcoming general election to cast their vote on the referendum cannot reasonably be placed in the same category as stuffing ballot boxes, invidious discrimination, election fraud, and race-based gerrymandering. The Court sympathizes with the Plaintiffs' frustration about waiting two and a half years after the filing of their petition in order to vote on city-status.  That said, the Court cannot find that Defendants' scheduling of this vote, despite doing so at a glacial pace, rises to the level sufficient to constitute an infringement on Plaintiffs' voting rights necessary to state a claim under Section 1983.

18

Even assuming, *arguendo*, that the timing issue was sufficient to state a claim under Section 1983, Plaintiffs would be unsuccessful on the merits of such a claim.  It is true that cases implicating the right to vote, for a time, categorically applied a strict scrutiny approach.  *See, e.g., Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173 (1979); *Reynolds,* 377 U.S. 533.  More recently, however, the Supreme Court has backed off of this stringent approach and has applied a more flexible standard.  *See, e.g., Burdick v. Takushi,* 504 U.S. 428, 432 (1992) (stating that it is an "erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny.").  "[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently."  *Id.* at 433.  Only when the right to vote has been subjected to "severe restrictions" does strict scrutiny applies. *Id.* at 434. "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions."  *Id.* at 434 (citing *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983); internal quotation marks omitted).

The scheduling of the referendum for November 2012 does not discriminate among Fishers' voters; rather, every voter must wait until the next general election to cast a vote on city-status.  Moreover, the Court does not believe that this regulation on Plaintiffs' right to vote on city-status is 'severe' within the meaning of *Burdick. See Crawford v. Marion County Election Board,* 553 U.S. 181, 205 (2008) (Scalia, J., concurring) ("Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe.... Burdens are severe if they go beyond the merely inconvenient.").  Because, here, the Defendants' decision to schedule the

vote for the next general election imposes only "reasonable, nondiscriminatory restrictions" on Plaintiffs' right to vote, the Court would apply the deferential "important regulatory interests" standard.

The Defendants' interest in the efficiency of holding the referendum during the already scheduled general election, as opposed to organizing a special vote on city-status, and their interest in having the highest possible voter turnout, which is virtually guaranteed by having the vote during the general election, is more than sufficient. There is little doubt that, if necessary, Defendants' decision regarding the timing of the referendum would pass muster under the important regulatory interests standard.

**G.** **Immunity**

Finally, Defendants have requested that the members of the Town Council of Fishers be granted immunity from individual liability. For the reasons below, the Court finds that the individual members of the Town Council of Fishers are shielded by the doctrine of absolute legislative immunity.

The doctrine of absolute legislative immunity allows local officials to be "absolutely immune from suit under Section 1983 for their legislative activities." *Bogan v. Scott-Harris,* 523 U.S. 44, 49 (1998). This immunity attaches itself to all actions taken by officials "in the sphere of legitimate legislative activity." *Id.* at 54 (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376 (1951)).

Specifically, Defendants contend that the town council members voted on and made legislative decisions regarding the adoption of the Reorganization Plan. The act of voting is "quintessentially legislative," and thus, the acts of the individual members qualify them for absolute immunity. *Bogan,* 523 U.S. at 55. The Court agrees. The act of voting on and adopting

20

the Reorganization Plan reflects a policy-making decision implicating the Town of Fishers and constitutes legislative action.  Therefore, Defendants are shielded from individual liability by absolute legislative immunity.[5]

## IV.   CONCLUSION

For the reasons set forth herein, it is the order of this Court that it shall retain jurisdiction of Plaintiffs' federal claims but abstain from deciding questions of federal constitutional law pending an authoritative determination of Plaintiffs' state law claims and interpretation of the contested state statutes by an Indiana state court.  For this to occur, Plaintiffs will need to re-file an action in state court.

Accordingly, the Court **DENIES** Defendants' Motion to Dismiss Plaintiffs' federal claims [Dkt. No. 21] and **DENIES** Defendants' Motion to set a Bond on Plaintiffs' state law claims. The Court will **STAY** proceedings here on the Plaintiffs' declaratory judgment claims, pending finality in the state court, and shall close this case administratively on the Court's docket during the pendency of the stay until such time as either party shall move to have it reopened.

SO ORDERED.

DATE:   _09/02/2011_____

_Tanya Walton Pratt_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

---

[5] Plaintiffs attempted to make an argument against a grant of legislative immunity; however, Plaintiffs' arguments on this point are without merit. That said, Plaintiffs did not attempt to rebut Defendants' contention that the individual town council members would also be entitled to qualified immunity. Assuming, *arguendo*, that legislative immunity did not apply, the individual defendants would nevertheless be protected by qualified immunity.

DISTRIBUTION:

Gary P. Price
LEWIS & KAPPES
gprice@lewis-kappes.com

Sara R. Blevins
LEWIS & KAPPES
sblevins@lewis-kappes.com

Steven Walter Griesemer
LEWIS & KAPPES
sgriesemer@lewis-kappes.com
Mark Jason Crandley
BARNES & THORNBURG LLP
mcrandley@btlaw.com

Kirk A. Horn
MANDEL HORN McGRATH & REYNOLDS, P.C.
khorn@mhmrlaw.com